Dunkin, Chancellor,
dissenting. Having been unable to concur in the conclusion of the Court, on the question submitted, it is, perhaps, proper that I should briefly relate the difficulties, which have suggested themselves.
*270 There are certain propositions, which', it seems to me, cannot he, at this day, questioned. In England, it is the settled law of this Court, that a bill will not lie for the specific delivery of a chattel, or for the performance of a contract in relation to chattels. The very few exceptions only confirm the rule. In the State of South Carolina, from the organization of the Court of chancery, until the year 1834, it is believed that not only has the English rule been uniformly recognized, without reference to the Act of Assembly, restricting the jurisdiction of the Court, but that in regard to this particular chattel, (slaves,) the principle by which this Court has concurred, was not left to speculation, or doubtful interpretation. It is believed, that anterior to the recent period mentioned, no decision can be found sanctioning ‘the doctrine now established ; and on the contrary, in the two cases, cited in the circuit decree, Rees vs. Parish and Farley vs. Farley, such doctrine was solemnly negatived, on demurrer, by the highest tribunals in the country. In Sartor vs. Gordon, and Horry vs. Glover, the Chancellor intimated his own opinion, clearly, that slaves, as a class, should constitute an exception to the rule. The decrees were affirmed, but it did appear to the Circuit Court, in this case, that those decrees might well be affirmed, without recognizing the broad principle, announced by the Chancellor. There were circumstances in those cases, which gave a peculiar value to the slaves claimed, in the estimation of the complainant; and the necessity of setting forth those circumstances evinced, at least, what was the general understanding of the profession, on this subject. These decisions did notprofess to over-rule Rees vs. Parish, and Farley vs. Farley, and it seems to the Circuit Court, that a doctrine so long and well settled, should not be abrogated by inference.
Heretofore, the rule had been, that to entitle the complainant to come into this Court, for the recovery of slaves, he must shew that there were circumstances which rendered it impracticable to measure their value to him in money. Having shewn this, the bill would lie. The rule now adopted is, that the bill will lie without showing any such circumstances. The necessity or expediency of so *271 enlarging the rule, I am unable to perceive. In ordinary cases, trover or detinue would afford an adequate remedy. If, in detinue, the plaintiff apprehends that the defendant would remove the property, this Court is open to his relief, to prevent such mischief. In the very well considered case of Robertson, vs. Bingley, 2 McCord, Ch. 333, Judge Nott, citing Lord Redesdale, says, “Courts of Equity will, in many cases, act as ancilliary to the administration of justice, in other Courts, by removing impediments to the fair decision of a question. And in illustration of the rule, that, pending a litigation, the property in dispute is often in danger of being lost or injured, and in such cases a Court of Equity will interpose to preserve it, if the powers of the Court, in which the litigation is, are insufficient for that purposeand he clearly shows that this principle is peculiarly applicable to actions of detinue in this country, for the delivery of negro property. But he also shews (what indeed is not questioned,) that the.authority of the Court is, in such cases, Merely ancilliary, and that the question of right must be determined in the ordinary tribunals. But the sufficiency of the remedy, in general cases, is best established by the long practice of the Courts, and the acquiescence of the community.
The great objection to giving the Court of Equity general jurisdiction, in questions of negro property, is that, in my mind, it is substantially an abrogation of the trial by jury, in all such controversies, where the complainant so desires. I say substantially, for although the Court of Equity may, in complex cases, direct an issue, the delay and expenses of such proceedings, render both the Court and the parties very reluctant to adopt them. The inestimable value of the trial by jury is one of those propositions to the correctness of which we are in the habit of assenting before we have understood their full force; but experience and reflection establish our faith and confirm our correctness. It is perhaps quite as important, that justice should be satisfactorily, as that it should be wisely or rightly administered. This mode of deciding controversies has always commended itself to the heads and the hearts of the community. A very acute observer of the habits and feelings of our country, Mr. DeTorquesville, regards the trial *272 by jury, as not only the most satisfactory mode of administering the laws, according to the genius of the people, but, as an important element in our political institutions. My apprehension is, that the practical effect of the judgment now pronounced will lie to withdraw, from the appropriate tribunals, a large class of cases, on which they are peculiarly qualified to decide, and which cannot be as satisfactorily investigated or determined in any other tribunal.
BENJ. F. DUNKIN.